**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO. 4:19-CV-00184-JHM**

**GRANITE STATE INSURANCE COMPANY**                                     **PLAINTIFF**

**V.**

**STAR MINE SERVICES, INC.**                                                            **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Granite State Insurance Company's Motion

for Summary Judgment [DN 53] and Defendant Star Mine Services, Inc.'s Motion for Partial

Summary Judgment [DN 52]. Fully briefed, this matter is ripe for decision. For the following

reasons, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for

Partial Summary Judgment is **DENIED**.

### I. BACKGROUND

In this workers' compensation insurance dispute, Plaintiff Granite State Insurance

Company seeks unpaid premiums from Defendant Star Mine Services.

Star Mine is a now-defunct staffing services company. It provided staffing to several

coal mines in Kentucky, Illinois, and Indiana. At all relevant times, Star Mine obtained its

workers' compensation insurance coverage from Granite State.[1] Although Star Mine obtained

insurance from Granite State for several years, each insurance contract had a one-year term. The

last insurance contract, which was in effect from February 1 through November 6, 2018, gives

rise to this litigation.

---

[1] The record sometimes refers to Granite State's parent company, AIG Property Casualty. [*See* DN 2]. For
clarity, the Court uses Granite State throughout.

The parties' insurance contract describes how the premium payments worked.  [DN 1-2].

Granite State issued an insurance contract to Star Mine at the start of each policy period.  The

contract detailed all aspects of Star Mine's insurance coverage.  It did not, however, specify the

final premium that Star Mine owed Granite State.   Instead, the parties used Star Mine's

anticipated payroll to estimate a premium payment.  [DN 1-2 at 9; DN 53-1 at 1–2, ¶ 3].  Granite

State did not calculate the final premium until the end of the year: the contract stipulated that

"[t]he final premium will be determined after this policy ends by using the actual, not the

estimated, premium basis and the proper classifications and rates that lawfully apply to the

business and work covered by this policy."  [DN 1-2 at 9, Part 5(E)].  Although the initial

premium was merely an estimate, Star Mine was responsible for paying that estimated premium

immediately.  The parties then settled the discrepancy at the end of the year, once Granite State

audited Star Mine's records and tabulated the actual calculations.  [*Id.*; *see also* DN 52-12 at

31:24–32:5].

Star Mine estimated its payroll at $2,467,687 for the 2018 policy.  [DN 1-2 at 12, 14, 16].

Based on this estimate, Granite State issued an insurance contract with an estimated premium of

$646,744.  [*Id.*].  Star Mine paid that premium.  Midway through the policy period, however,

Granite State completed its audit of Star Mine's 2017 policy.  The audit revealed that Star Mine

had underestimated its payroll by roughly thirty percent, necessitating a $302,713 end-of-year

reconciliation payment.[2]  [DN 53-1 at 2 ¶ 4].  Star Mine had significantly underestimated its

payroll for the 2016 policy as well.  [*Id.*].  Recognizing Star Mine's trend of underestimating its

---

[2] The primary issue, it appears, is that Star Mine significantly underestimated its payroll in Illinois and Indiana. For example, at the start of the 2018 policy, Star Mine estimated its total Indiana payroll for "Concrete Construction" workers was $189,442, resulting in a $10,476 premium for those employees.  [DN 1-2 at 14].  The revised 2018 policy, based on Star Mine's actual 2017 payroll, estimated Star Mine's Indiana "Concrete Construction" payroll at $989,520.  [DN 53-1 at 86].  This increased Star Mine's premium to $54,720.  [*Id.*].  Illinois provides an even more dramatic example.  Star Mine estimated its Illinois "Concrete Construction" payroll at $33,919.  [DN 1-2 at 12].  The revised premium estimated that payroll at $836,959.  [DN 53-1 at 84–85].

payroll at the start of the year (and thus reducing its initial insurance premium payment), Granite State acted proactively for the 2018 policy—it issued a mid-year policy "endorsement" to Star Mine. [DN 53-1 at 83–95]. The endorsement recalculated Star Mine's estimated 2018 premium based on its actual 2017 payroll, not Star Mine's "anticipated" 2018 payroll. [*Id*. at 2 ¶ 6; *id*. at 83]. The recalculated premium was $992,187, $345,443 higher than the estimated premium Star Mine paid at the start of the year. [*Id*. at 83]. Granite State gave Star Mine four weeks to pay the added premium. [*Id*. at 2 ¶ 6]. Star Mine did not pay, so Granite State cancelled the policy on November 6, 2018. [DN 24-1]. Star Mine simultaneously shut down business operations. [DN 38-3 at 3 (contemporaneous notes from Star Mine's insurance agent, explaining that Star Mine moved all its employees to another company the same day Granite State cancelled the policy)].

After Granite State cancelled the policy and Star Mine closed its business, Granite State attempted to conduct its end-of-policy audit. In January 2019, a Granite State auditor contacted Star Mine executives, notifying them of the audit and describing the information they needed to provide. [DN 53-1 at 97]. The executives ignored the email; they also ignored several subsequent attempts to schedule the audit. [*Id*. at 100–101 (letter detailing eight attempts to contact Star Mine executives or Star Mine's insurance agent)]. Granite State warned Star Mine that audit noncompliance would result in (a) an estimated premium based on prior year estimates and (b) an audit noncompliance charge. [*See id.* at 107–108].

The audit noncompliance charge was especially harsh. It allowed Granite State to charge two times the total premium for all its Illinois and Kentucky payroll if Star Mine did "not allow [Granite State] to examine and audit all of [its] records that relate to this policy, and/or do not provide audit information as requested." [DN 1-2 at 29]. The audit noncompliance provision

was included in the original insurance contract, and Granite State again warned Star Mine of this provision while it attempted to conduct the audit.  [DN 53-1 at 108].

A Star Mine executive eventually sent over some, but not all, of the required information. [*Id*. at 116].  Granite State attempted to track down the remaining information, to no avail.  [*Id*.]. So after two months, dozens of emails and phone calls, and several extensions, Granite State finally marked the audit noncooperative.  It estimated Star Mine's payroll based on its 2017 policy year numbers, discounted by the twelve weeks that the 2018 policy was not effective.  It also charged the two-times audit noncompliance charge—$499,880 for Star Mine's Illinois employees and $722,038 for its Kentucky employees.  [DN 1–3 at 4, 10].  Adding up these totals, Star Mine was charged $1,139,880 on top of the $345,443 already outstanding—a total of $1,485,323.  [*Id*. at 11].  Granite State sent a demand letter to Star Mine [DN 1-4], but Star Mine apparently never responded.  A few months later, Granite State sued for breach of contract. [DN 1].

Discovery recently closed and the parties bring competing motions for summary judgment.  Granite State argues there is no dispute that Star Mine breached its duty to pay all amounts due, necessitating judgment for the full amount due: $1,366,378 plus interest.[3]  [DN 53].  Star Mine concedes it owes Granite State some money [*see* DN 56 at 9], but strenuously disputes the amount due.  It moves for summary judgment on the audit noncompliance charge, which it claims is an unenforceable penalty.  [DN 52-1].  It also defends against Granite State's motion, claiming alleged factual discrepancies cast doubt on the amount it owes Granite State.

---

[3] Throughout the litigation, Granite State sought $1,485,323 from Star Mine.  But after the parties briefed their summary judgment motions, Granite State filed a supplemental motion [DN 60] revising the asserted amount downward to $1,366,378.  This belated revision was due to an internal error in Granite State's system, which failed to apply a post-policy insurance rating factor change to Star Mine.  [DN 60-1 at 2 ¶ 4].  The rating factor change occurred after the start of this litigation and is not relevant to this case, except that it revises Star Mine's amount due downward by roughly $119,000.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the nonmoving party, the nonmoving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the nonmoving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

The only question for the Court is how much money Star Mine owes Granite State. Both parties agree Star Mine owes something. But the parties vigorously contest how much. Granite State maintains that amount is $1,366,378 plus interest. [DN 60-1 at 3 ¶ 7]. Star Mine suggests

that number is much lower, as little as $97,396.  [DN 56 at 5].  Both parties move for summary

judgment on their respective positions.  Star Mine moves for partial summary judgment on

Granite State's application of the audit noncompliance charge, a charge imposed by Granite State

that makes up $1.153 million of the $1.366 million allegedly owed.  Granite State moves for

summary judgment on the entire amount due.  The Court will consider each argument in turn.[4]

### A.  Star Mine's Motion: Audit Noncompliance Charge

Star Mine moves for summary judgment on part of Granite State's claim, arguing that

Granite State improperly applied the audit noncompliance charge.[5]  [DN 52-1].  The audit

noncompliance provision in the insurance contract states that

> If you do not allow us to examine and audit all of your records that relate to this
> policy, and/or do not provide audit information as requested, we may apply an
> Audit Noncompliance Charge. . . . If you allow us to examine and audit all of
> your records after we have applied an Audit Noncompliance Charge, we will

---

[4] Granite State argues, both in its motion and in response to Star Mine's motion, that Star Mine's failure to exhaust administrative remedies prevents Star Mine from contesting the amount due.  [DN 53 at 8–10; DN 57 at 5–7].  It points to KRS § 304.13-161, which mandates a two-part workers' compensation appeal process for any person "aggrieved by the application of [an insurer's] rating system."

Typically, in Kentucky, "exhaustion of administrative remedies is required prior to resort to the courts."  *Ky. State Police v. Scott*, 529 S.W.3d 711, 716 (Ky. 2017).  But the Court is not convinced that Star Mine needed to exhaust administrative remedies in this case.  The relevant statutory provision requires administrative exhaustion only for disputes about the "application of [a] rating system."  KRS § 304.13-161(1).  It *does not* require administrative exhaustion for all workers' compensation insurance disputes.  This case involves premium calculations and the application of an audit noncompliance fee.  The statute does not define the scope of a "rating system."  *See* KRS § 304.13-011.  Nor does Granite State explain how the statutory term "rating system" clearly encompasses these premium calculations and the audit noncompliance fee.  Star Mine argued the term does not include premium calculations [DN 56 at 9], an argument Granite State did not respond to.

Also, more broadly, Granite State is attempting to use administrative exhaustion offensively against Star Mine.  While offensive use of administrative exhaustion is not unprecedented, *see McGee v. United States*, 402 U.S. 479, 486 (1971), it is uncommon.  Administrative exhaustion typically is an affirmative defense.  *Bushong v. Delaware City Sch. Dist.*, 851 F. App'x 541 (6th Cir. 2021) ("Exhaustion of administrative remedies [is an] affirmative defense" (cleaned up)).

Because the Court is not certain whether KRS § 304.13-161 applies, it is hesitant to enforce administrative exhaustion offensively in this case.  And given the resolution of the other issues in this case, the Court need not reach this issue.

[5] Star Mine's motion only moved for summary judgment on $722,038 of Granite State's claim, the original amount of the Kentucky audit noncompliance charge.  [DN 52-1 at 1 (Star Mine's motion); DN 1-3 at 10 (Kentucky audit noncompliance charge)].  But later, in its reply brief, Star Mine asked for summary judgment on $1,221,918—the original amount of the Kentucky and Illinois audit noncompliance charges combined.  [DN 1-3 at 4 (Illinois audit noncompliance charge)].  Given the resolution of this issue, the Court need not resolve whether Star Mine can increase the amount sought in summary judgment in a reply brief.

revise your premium in accordance with our manuals and Part 5-Premium E (Final Premium) of this policy.

[DN 1-2 at 29]. Star Mine reasons that Granite State improperly applied this provision for two reasons. First, the provision is an unenforceable penalty under Kentucky law. Second, if the provision is enforceable, Granite State improperly applied it because Star Mine fully complied with the audit.

### i.    Filed Rate Doctrine

First, Star Mine maintains that it is entitled to summary judgment because the audit noncompliance charge, which ascribed a two-times fee if Star Mine did not comply with a mandatory post-policy audit, is an unenforceable penalty. [DN 52-1 at 12]. Kentucky law does not enforce any contract provision deemed a "penalty." *Patel v. Tuttle Props., LLC*, 392 S.W.3d 384, 387 (Ky. 2013).

The Court cannot reach the merits of Star Mine's argument, however, because the "filed rate doctrine" precludes judicial review of the audit noncompliance charge. The filed rate doctrine provides that "any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by the ratepayers." *Flint v. MetLife Ins. Co.*, 460 F. App'x 483, 485 (6th Cir. 2011) (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994)). Kentucky courts have specifically extended the filed rate doctrine to bar judicial review of insurance rates approved by the Kentucky Commissioner of Insurance. *Commonwealth ex rel. Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48, 53 (Ky. Ct. App. 1999).

The Kentucky Commissioner of Insurance has designated the National Council on Compensation Insurance ("NCCI") as the Commonwealth's advisory organization that sets workers' compensation insurance rates. *See* KRS § 304.13-167(1); *see also Review*

*Requirements Checklist – Workers' Compensation*, Ky. Dep't of Ins. 5 (2d ed. 2008) https://insurance.ky.gov/ppc/Documents/WorkerComp0608.pdf ("NCCI has been designated as the uniform classification system and experience rating system. Every insurer . . . must utilize NCCI's classification system."). In 2017, the NCCI implemented an audit noncompliance charge in most of its member states. [DN 57-2 at 3]. In Kentucky, the NCCI permits an audit noncompliance charge up to two times the annual premium. [*Id*. at 9].

Both sides agree that the filed rate doctrine precludes judicial review of the *rates* set by the NCCI. [DN 58 at 2 ("[Star Mine] readily admits that the rate charged is not subject to collateral attack.")]. But Star Mine contends the audit noncompliance charge is not a rate at all. Distinguishing the "rates" in the insurance contract from the audit noncompliance charge, Star Mine claims the latter "is unrelated to the rates approved by the Kentucky Department of [I]nsurance." [*Id*.].

The audit noncompliance charge is surely not a typical "rate"—that is, it is not an "amount of premium per unit of insurance." *Rate*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/rate. It is a proportional charge based on certain conduct unrelated to the insured's underlying business. The filed rate doctrine, however, precludes judicial review of *any charges* filed with the state regulatory commission; the doctrine does not include only those "rates" that fit the dictionary definition. *See Am. Tel. & Telegraph Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221–23 (1998) (reasoning that, when a federal statute required companies to file schedules containing all their charges with a regulatory commission, all charges filed were subject to the filed rate doctrine). Thus, it does not matter whether the audit noncompliance charge is a "rate"—the key question is whether the NCCI or Granite State filed the audit noncompliance charge with the Kentucky Commissioner of Insurance. *See Williams v. Duke*

*Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012) ("[I]t is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine.") (quoting *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000)). Neither side points to any definitive proof one way or another. But upon review, the Court is convinced the audit noncompliance charge was filed with the Department of Insurance.

Subtitle 13 of the Kentucky Insurance Code supplies the law governing "Rates and Rating Organizations." KRS § 304.13-010, et seq. It covers workers' compensation insurers. KRS § 304.13-021. The provisions of this subtitle require insurers and advisory organizations to file several types of documents with the Commissioner of Insurance. Some of the documents that the insurer or advisory organization must file include all "rates," "special assessments," and "prospective loss costs." *See* KRS § 304.13–051(1) (requiring insurers to file "rates and supplementary information"); § 304.13-165(1) ("Every advisory organization shall file with the commissioner . . . all prospective loss costs, provisions for special assessments, and all supplementary rating information, and every change or amendment or modification of any of the foregoing proposed for use in Kentucky."). It is not immediately clear which category the audit noncompliance charge falls within, *see* KRS § 304.13-011(21)–(23) (defining those terms), but all three categories must be filed with the Department of Insurance and it appears almost certain that the audit noncompliance charge falls into one of those three categories. Nor are those the only types of information that insurers or advisory organizations must file: the statutory scheme requires many more. *See* KRS § 304.13-051(4) ("Every insurer shall file with the commissioner all rating manuals and underwriting rules that it uses in this state not later than fifteen days after they become effective. Manuals, rules, and guidelines must be adhered to until amended."); § 304.13-167(1) ("Every workers' compensation insurer shall adhere to a uniform classification

system and uniform experience rating system filed with the commissioner by an advisory organization designated by the commissioner."). This is not a statutory scheme that requires insurers and advisory organizations to file only select documents. Through the various provisions in subtitle 13, workers' compensation insurers and the NCCI must file virtually all potential charges with the Commissioner of Insurance. The audit noncompliance charge, which is a designated charge in the NCCI manual, naturally falls within this extensive category of required filings. The audit noncompliance charge needed to be filed with the Commissioner of Insurance, so the filed rate doctrine precludes the Court's consideration of Star Mine's argument.

The principles underlying the filed rate doctrine reinforce this conclusion. "[T]he filed rate doctrine is but a special instance of the more general principle . . . that legislative functions are outside the scope of judicial power." *Chandler*, 8 S.W.3d at 53. In *Chandler*, the Kentucky Court of Appeals rejected the state attorney general's claim for damages against a healthcare provider that charged allegedly excessive premiums. *Id*. at 50, 53. The court first determined that "health insurance premium rates were required to be filed with and approved by the Department of Insurance," so the filed rate doctrine applied. *Id*. at 53. It then went on to opine that "[t]he legislative polices embodied in the insurance code . . . are sufficiently comprehensive to remove health insurance regulation from the common law in Kentucky and to invoke the filed rate doctrine." *Id*. Here too, the "legislative policies embodied in the insurance code" for workers' compensation are comprehensive enough that the Court must invoke the filed rate doctrine.

Star Mine argues that, since it does not attack the reasonableness of the rate but only its legality, the filed rate doctrine should not apply. [DN 58 at 2–3]. But courts have previously considered, and rejected, nearly identical arguments. *See Schermer v. State Farm Fire & Cas.*

10

*Co.*, 721 N.W.2d 307, 314 (Minn. 2006).  In *Schermer*, the Minnesota Supreme Court held that the filed rate doctrine barred a challenge to the legality of a house insurance policy surcharge for old homes.  The plaintiffs argued that "because their challenge is not to the reasonableness of the [surcharge], but to its legality," the filed rate doctrine did not apply.  *Id*.  But the court disagreed, reasoning that a "court-ordered refund of State Farm's surcharge would interfere with the regulatory scheme established by the legislature and with the ratemaking functions of the [regulatory agency]."  *Id*.  Similarly, invalidating the audit noncompliance charge in this case would interfere with the extensive regulatory scheme for Kentucky workers' compensation insurance.  The filed rate doctrine prevents the Court from considering the legality of the audit noncompliance charge.

### ii.    Application of the Audit Noncompliance Charge

Failing to establish the unenforceability of the audit noncompliance charge, Star Mine moves on to challenge the specific application of the audit noncompliance charge here.  It argues it provided all documents required to complete the audit, so Granite State should rescind the noncompliance charge.  [DN 52-1 at 13].

To understand Star Mine's argument, a brief fact review is required.  A Granite State auditor emailed Star Mine in January 2019 to advise that it was auditing Star Mine's 2018 policy, as required by the insurance contract.  The auditor requested six items from Star Mine. [DN 53-1 at 97].  Star Mine did not respond.  Over the next two months, the auditor contacted Star Mine executives or their insurance agent at least eight times.  [*Id*. at 101–02 (summarizing efforts)].  Star Mine eventually provided three items but did not provide the others.  So, on March 22, 2019, the auditor emailed Star Mine to advise that she was giving up and marking the audit noncompliant.  [*Id*. at 117].  The email mentioned that, if Star Mine changed its mind and

wanted to comply, it needed to provide three more items.  [*Id*.].  The auditor also asked for a fourth item: a "[c]omplete description of employee duties for each company/work location including tools and materials used."  [*Id*.].  The auditor had not asked for that description of employee job duties in the first request in January.  Three days after that email, a Star Mine employee provided a few more items.  [*Id*. at 116].  But two items, including the description of employee job duties, remained outstanding.  The auditor emailed back, asking about the two remaining items.  [*Id*.].  Star Mine did not produce those items, so Granite State applied the audit noncompliance charge.

Neither party disputes that prior to this litigation, Star Mine had not provided all required audit documents.  In its motion for summary judgment, however, Star Mine asserted it rectified that error during discovery in this case.  [DN 52-1 at 8 ("These requested documents were provided to the Plaintiff through the course of discovery")].  Star Mine suggests this belated addendum should wipe out the audit noncompliance charge.  But after Granite State pointed out in its response that "Star Mine has never produced a description of the job duties of its workers," [DN 57 at 9], Star Mine revised its position—it now claims that it produced "all the documentation *originally* requested."  [DN 58 at 6 (emphasis added)].  The Court construes this as an implicit acknowledgement that Star Mine has not produced the final item Granite State requested in March of 2019: the description of employee job duties.

The audit noncompliance provision in the insurance contract provides no textual limit on when Star Mine can provide the requested documents.  In fact, the provision specifically acknowledges that "[i]f you allow us to examine and audit all of your records *after* we have applied an Audit Noncompliance Charge, *we will revise* your premium . . . ."  [DN 1-2 at 29

(emphasis added)].   So, the fact that Star Mine had not produced all documentation before

Granite State applied the audit noncompliance charge in March of 2019 is not determinative.

What is determinative, however, is that Star Mine *still* has not produced all requested

documentation.  Granite State first applied the audit noncompliance charge nearly two-and-a-half

years ago and sued Star Mine soon after.  The parties exchanged discovery, took depositions, and

filed motions.  Through all that time, Star Mine never produced a description of the employee

job duties.  So, though the audit noncompliance charge provides no limitation on when Star Mine

will turn over all requested documentation, it assumes it will happen eventually.  But Star Mine

has not turned over all requested documentation.  After two-and-a-half years, the Court can only

assume it never will.

Star Mine takes the position that it need not produce a complete description of its

employee job duties because that item was not among the "documentation originally requested."

[DN 58 at 6].  But Star Mine identifies no contract provision or NCCI standard requiring Star

Mine to produce only the items Granite State originally requested.  Nor does Star Mine cite any

provision limiting the items Granite State can request to complete the audit.  In fact, the audit

noncompliance charge implies exactly the opposite.  It requires Star Mine to allow Granite State

access to "all of your records that relate to this policy."  [DN 1-2 at 29].  A description of

employee job duties clearly "relate[s]" to the workers' compensation policy—the description

would clarify the type of work employees perform and where they perform it, an important

consideration in an insurance policy that charges different rates depending on the type of work

performed.  [*See, e.g.*, DN 53-1 at 122 (rate of 28.5 for employees performing "Coal Mine" work

versus rate of 25.44 for employees performing "Concrete Construction" work)].  So, per the

plain language of the audit noncompliance charge, Granite State could request any items at any

time so long as those items "relate" to the workers' compensation policy. The description of employee job duties "relate[s]" to the policy, thus Star Mine needed to produce it. It does not matter when Granite State requested it.

To this day, Star Mine has not produced all items necessary for Granite State to complete the audit. Any reasonable time to produce the requested information has long since passed. *See generally* KRS § 355.2-309(1) ("The time for . . . delivery or any other action under a contract if not . . . agreed upon shall be a reasonable time."). Star Mine did not comply with the audit. Granite State correctly applied the audit noncompliance charge.

**B. Granite State's Motion – Premiums Due**

Since Granite State properly applied the audit noncompliance charge against Star Mine, the Court next considers whether the parties have any other genuine dispute about the amount Star Mine owes.

Granite State contends that Star Mine owes $1,366,378 plus interest. [DN 60-1 at 3 ¶ 7]. In support, it provides the original insurance policy [DN 1-2; *see also* DN 53-1 at 7–57], the itemized final adjustment after Star Mine did not comply with the audit [DN 1-3, *see also* DN 53-1 at 120–130], and a demand letter requesting full payment [DN 1-4]. With these items, plus documentation explaining the communications that led to the noncompliant audit [DN 53-1 at 97–117], Granite State has established all elements of a breach of contract claim: (1) a contract existed between the parties (insurance contract), (2) Star Mine breached the contract by not paying premiums due, and (3) Granite State suffered $1,485,323 in damages because of Star Mine's breach. *See EQT Production Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019) (breach of contract claim in Kentucky requires existence of contract, breach of that contract, and damages flowing from the breach). Granite State has thus met its initial burden of

showing no genuine dispute of fact.  *See Celotex*, 477 U.S. at 322.  The burden shifts to Star

Mine to provide evidence supporting a genuine dispute of fact.  *Anderson*, 477 U.S. at 247–48.

Star Mine's main rebuttal is that Granite State erroneously used Star Mine's 2017 payroll,

not its 2018 payroll, when calculating the end-of-year premium.  [DN 56 at 6–8].  Had Granite

State used the correct payroll numbers, Star Mine contends, its premium would have been lower.

Star Mine's argument fails because it glosses over the singular reason why Granite State needed

to use Star Mine's 2017 payroll: Star Mine never complied with the 2018 audit.

The insurance contract contemplated a two-step process to calculate premiums: estimated

premium at the beginning of the year, final premium after the audit at the end of the year.  [DN

1-2 at 9, Part 5(E)].  Star Mine originally estimated its payroll at the beginning of the year, then

Granite State revised that estimate after auditing Star Mine's final 2017 policy.[6]  But that was

only an estimated premium.  After it cancelled the policy, Granite State attempted to audit Star

Mine's records and calculate the final premium.  But Granite State could not complete the audit

because Star Mine never turned over all requested information.  So Granite State could not

calculate a final premium.  This meant that Granite State needed some other method to calculate

the final premium.  It used the mid-year estimated payroll, which was based on Star Mine's 2017

payroll.  This estimate was a fair method to estimate Star Mine's payroll without final numbers.

If Star Mine believes the estimate is inaccurate, it has no one to blame but itself.  It

should have complied with the audit.  Had Star Mine complied with the audit, Granite State

would not have used the estimated payroll.

---

[6] Star Mine claims that the insurance contract did not permit Granite State's mid-year revision.  Star Mine's argument is meritless.  The insurance contract incorporates Granite State's "manual of rules" for premium determinations.  [DN 1-2 at 9, Part 5(A)].  Granite State's manual of rules, promulgated by the NCCI, states that "[e]stimated payrolls for each classification reflect actual payroll anticipated by the insured during the policy period. *Such estimates are subject to substantiation by the carrier through evaluation of records* or inspections."  [DN 53-1 at 65 (emphasis added)].  This manual of rules, incorporated through Part 5(A) of the insurance contract, allowed Granite State to substantiate Star Mine's estimates during the policy year, and adjust the estimated premium accordingly.

15

Star Mine also suggests Granite State did not reduce the premium to reflect the shortened policy period. [DN 56 at 6]. This argument is similarly meritless. The 2018 insurance contract ran from February 1, 2018 through February 1, 2019. Granite State cancelled the policy on November 6, 2018, roughly twelve weeks before the scheduled end. Because the policy was not effective for all fifty-two weeks, Granite State revised its calculations to account for the shortened policy period. For example, in the 2018 revised premium (which anticipated a full fifty-two-week policy), Granite State estimated Star Mine's Illinois "Concrete Construction" payroll at $836,959. [DN 53-1 at 84–85]. In the final calculations, with the twelve-week reduction, the payroll was $637,763 [DN 53-1 at 122], which is 76.2 percent of the $836,959 payroll anticipated during the year. This 23.8 percent reduction tracks the twelve weeks the policy was not effective.

Falling short everywhere else, Star Mine attempts to muddy the waters by accusing Granite State of inconsistent payment calculations and demands. [DN 56 at 6 ("[T]he Plaintiff keeps changing the amounts it is claiming, and attempts to manipulate its own numbers"); *id*. at 4 ("[B]y the Plaintiff's own admission, the most the Defendant can owe is $744,140.25."); DN 58 at 2 n.1 (suggesting that Granite State claimed "patently inconsistent and varying amounts")]. Star Mine's confusion, though perhaps understandable in this technical insurance dispute, is baseless. Granite State's original demand letter to Star Mine sought $1,485,323. [DN 1-4]. It filed its complaint months later, again asking for $1,485,323. [DN 1 at 6 ¶ 42]. It asked Star Mine to admit it owed that exact amount in discovery. [DN 53-4 ¶ 2 (Granite State's requests for admission)]. It asked for the same amount at summary judgment. [DN 53 at 1; DN 57 at 1]. It only revised the amount sought after summary judgment briefing was complete, based on factors unrelated to this case. *See supra* n.3; [*see also* DN 60]. Granite State has been nothing but

16

consistent in the amount of money it seeks. Further, Granite State's method of calculating the amount due is relatively straightforward, at least by the standards of this case. The "Audit Advice" document provides Granite State's calculations. Granite State attached the Audit Advice to its complaint, to its summary judgment motion, and to its post-summary judgment revision. [DN 1-3; DN 53-1 at 120–130; DN 60-1 at 14–25]. The Audit Advice outlines all itemized charges for each state where Star Mine conducted business. At the end of each state's charges, a row provides the "State Final Total." [DN 60-1 at 18, 20, 24]. The totals are $705,590 (Illinois), $67,214 (Indiana), and $1,240,318 (Kentucky). Combined, those three totals equal $2,013,122 in premium owed. And as Granite State stipulates, Star Mine paid $646,744 in estimated premium at the start of the year. [DN 53 at 2]. $1,366,378 is merely the difference between Star Mine's total bill ($2,013,122) and what it already paid ($646,744). There is no genuine dispute that Granite State correctly calculated the amount due. Nor is there any genuine dispute that Granite State is entitled to the full amount sought.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff Granite State Insurance Company's Motion for Summary Judgment [DN 53] is **GRANTED**. Defendant Star Mine Services, Inc.'s Motion for Partial Summary Judgment [DN 52] is **DENIED**. Granite State's Motion to Supplement [DN 60] is **GRANTED**. The Court enters judgment for Granite State Insurance Company in the amount of $1,366,378 plus interest.

Joseph H. McKinley Jr., Senior Judge
United States District Court

August 9, 2021

cc:     Counsel of Record